Eastern District of Kentucky
**FILED**

SEP 3 0 2010

AT COVINGTON
LESLIE G WHITMER
CLERK U S DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 06-141-DLB**

**L. CRAIG KENDRICK, ET AL.**                                      **PLAINTIFFS**

**vs.**

**STANDARD FIRE INSURANCE**
**COMPANY, ET AL.**                                                  **DEFENDANTS**

* * * * * * * * * * * * * * * * * *

**CIVIL ACTION NO. 06-146-DLB**

**JAMES D. NICHOLS, ET AL.**                                        **PLAINTIFFS**

**vs.**

**PROGRESSIVE DIRECT**
**INSURANCE CO., ET AL.**                                            **DEFENDANTS**

* * * * * * * *

## OPINION & ORDER[1]

These actions[2] are currently before the Court on Plaintiffs' Motions for Class

Certification (Doc. #333 in 06-141 and Doc. #214 in 06-146).  Briefing on the motions

having been concluded, and oral argument having been conducted, the motions are ripe

for decision.

---

[1]Pursuant to the E-Government Act of 2002, this is a written Opinion and therefore is available electronically.  However, it has been entered only to decide the motions addressed herein and is not intended for official publication or to serve as precedent.

[2]These two proceedings are substantially similar in their presentation and procedural history, but with different party names.  Since the present filings on the issue of class certification are similar, timing issues are similar, and all counsel in the two cases requested to be heard jointly, the pending motions are addressed together.

These two cases have traveled a long and bumpy road. What started out in each case as proposals for massive plaintiff and defendant classes on a myriad of claims has now been, through the course of much time, no-doubt significant expense, and protracted and contentious pre-certification discovery, refined to proposals for plaintiff classes only in each, limited to four claims, and with subclasses against each particular remaining[3] named Defendant. By this process and these decisions, Plaintiffs have wisely chosen to steel their case. Given the number of parties and the Commonwealth-wide impact of Plaintiffs' claims on local government taxes billing and collection practices, the filings related to certification have been extensive, raising what seems every conceivable protest to this prospect. The Court has considered these massive filings,[4] and has also heard from

---

[3]In 06-141, the claims Plaintiff David Knight brought against Defendant Chicago Title Insurance Company were voluntarily dismissed with prejudice by joint stipulation (see Doc. #297). In 06-146, the claims Plaintiffs Mark and Amy Hahn brought against Defendant Kentucky Farm Bureau Insurance Company were dismissed with prejudice by agreed order (see Doc. #111), and the claims Plaintiffs James and Anna Nichols brought against Progressive Direct Insurance Company were dismissed with prejudice by order granting said Defendant's summary judgment motion (see Doc. #145).

In addition, during the course of the precertification discovery phase, certain named Plaintiffs and Defendants in both cases reached voluntary class settlements of the claims between those particular parties. Procedurally, each of these proposed class settlements between those particular parties have been either preliminarily or finally approved. Specifically, the following class settlements have been finally approved by the Court – (a) in 06-141: (1) Martha Yunker v. Hartford Underwriters (see Doc. #342); (2) Alexander Edmondson v. Westfield National Insurance Company (see Doc. #414); (3) Stella Geise v. Capitol Indemnity (see Doc. #415); (4) Charles Stephen Hamilton v. Stewart Title Guaranty Co. (see Doc. #437); and (5) Karla McCullough v. American International South Insurance Company (see Doc. #475); (b) in 06-146: (1) Jamie Brown v. Safe Auto Insurance Company (see Doc. #162); (2) Ruth Culyer v. Shelter Mutual and Shelter General Insurance Companies (see Doc. #221); (3) Dixie Dew Products, Incorporated v. Acuity, a Mutual Insurance Company (see Doc. #268); (4) Greg and Brenda Adamkiewicz v. Alfa Vision Insurance (see Doc. #264); and (5) Robert Nesbitt v. Foremost Insurance Company (see Doc. #287). In addition, the preliminarily approved class settlement in James K. Jarboe v. Progressive Direct Insurance Company is awaiting final approval by the Court (see Doc. #305) (order of preliminary approval).

[4]These filings on certification include various filings of what both sides perceived to be relevant supplemental authorities. Most of these supplements were filed outright in these actions

counsel at oral argument.  Being sufficiently advised, the Court concludes for the reasons

that follow that Plaintiffs' Motions for Class Certification (Doc. #333 in 06-141 and Doc.

#214 in 06-146) will be **granted**.

### FACTUAL AND PROCEDURAL OVERVIEW

This case is about the insurance industry and local government taxation of that

industry, at least as it is done in Kentucky.[5]  The basic facts of the suit are not complicated,

although the breadth of their application, sweeping as they do across an industry that

touches so many persons, and on a point that is so "certain" (i.e., death and taxes),

renders this proceeding a complex one.

The various named Plaintiffs are policyholders of the various named Defendant

insurers.  In conjunction with the license fees charged an insurer for the privilege of

conducting insurance business in the Commonwealth, local governments are statutorily

authorized to impose a tax on insurers on the premiums the insurer collects on certain

types of insurance sold by the insurers.[6]  While the tax is imposed upon and payable by

_____

as notices of supplemental authority.  However, one such filing in each of these cases was presented in the form of a motion request for leave to file such further authority and present further limited argument arising therefrom.  (Doc. #445 in 06-141; Doc. #295 in 06-146).  Plaintiffs did not oppose the filing of this supplemental argument, instead filing a response directed to its merits. Accordingly, these two motions will be granted in the Order at the conclusion of this Opinion.

[5]The parties have represented at argument that the particular local government setup and taxation of insurance in Kentucky is unique from all other states, at least as it existed at the time of filing.  The Court's attention has been directed to the fact that, in part due to this litigation, the Kentucky legislature has substantially changed the statutes governing this area, which legislative changes took effect on July 15, 2008.

[6]Kentucky Revised Statutes Chapter 91A, Finance and Revenue of Cities, permits local governments to elect "to impose and collect license fees or taxes upon insurance companies for the privilege of engaging in the business of insurance[.]" K.R.S. § 91A.080(1).  The statute allows for the insurer to charge a "reasonable collection fee" as compensation for collecting the taxes that are remitted to the particular local government authority.  *Id.* § 91A.080(4).  The license fee or tax

the insurer, virtually if not all insurers writing policies in the Commonwealth pass this tax on to the insured. This charge to insureds for the insurer's local government premium tax is the foundation for Plaintiffs' lawsuit. Plaintiffs' claim their insurers charged them a local government tax on their premiums, when the tax was either not owed or the tax amount owed was less than that billed by the insurer. According to Plaintiffs' theory of their case, this erroneous charge for local government premium taxes was not simply inadvertent or accidental, but rather illegal, unlawful, and/or wrongfully imposed on them and thereby subjects the insurers to legal liability.

When these cases were first removed to this Court, named Plaintiffs' lawsuits sought to present a most unwieldy proposed class of Plaintiffs, as well as Defendant class of insurers authorized to do business in the state and who had been improperly charging local government premium taxes.[7] Understandably, Plaintiffs' Complaints were challenged by a variety of threshold motions from the various insurer Defendants. Though skeptical at the viability of the enormity of what they were proposing,[8] which skepticism was

---

is imposed upon the insurer for life insurance policies issued "upon the lives of persons residing within the corporate limits of the [local government authority]." *Id.* § 91A.080(2). It is imposed upon the insurer for policies other than life "on risks located within the corporate limits of the [local government authority]." *Id.* § 91A.080(3).

[7]The class initially proposed in both actions was:
All customers of the Defendants and customers of any other insurance company doing business in the Commonwealth of Kentucky who purchased an insurance policy and who were unlawfully charged local government premium taxes or collection fees for the period of time from January 2001 to the present and have not had their premiums returned to them by the date of the filing of the Complaint.

[8]In addition to the sizeable scope of the articulated class, Plaintiffs were also presenting at least eight claims in the Complaints, for Illegal Dealing in Premiums in violation of KRS 304.1-190; fraud; conversion; negligent misrepresentation and servicing; breach of fiduciary duty; civil conspiracy; declaration of rights; and vicarious liability.

4

expressed by the Court, Plaintiffs nevertheless were permitted to press forward after threshold motions, the Court of the belief that what seemed to lie at the heart of their charge ought not be dismissed on more technical defensive grounds.

The named parties pressed on with pre-certification discovery, a task that can only be described as acrimonious at best. During this time, similar additional lawsuits were filed.[9] Also in this interval, some of the parties did reach voluntary settlements.[10] Now before the Court are the remaining named parties; they seek a determination on whether plaintiff classes should be certified in these cases.

## DISCUSSION

### A. *Introductory and Preliminary Matters*

The class certification motions filed by Plaintiffs proposes that the following plaintiff class be certified in each case:

> All persons in the Commonwealth of Kentucky who purchased insurance from or underwritten by [Defendant insurer] during the Relevant Time Period [(June 16, 2001, through the present) for 06-141 and (June 22, 2001, through the present) for 06-146] and who were charged local government taxes on their payment of premiums which were either not owed, or were at rates higher than permitted.[11]

---

[9]Several additional suits were subsequently filed in this district by Plaintiffs' counsel. These suits, however, were separately filed against individual insurers and did not propose a defendant class.

[10]*See* note 3, *supra.* Moreover, the two approved class settlements noted were each presented to the Court in 06-141 and 06-146 by motion filed subsequent to briefing and oral argument on certification. The insurers in those class settlements, American International South Insurance Company (finally approved) and Progressive Direct Insurance Company (preliminarily approved), both participated in the briefing and argument opposing class certification.

[11]According to Plaintiffs' Motions, excluded from the proposed class would be (a) any Judge or Magistrate presiding over this action and members of their families; (b) Defendants and any entity in which Defendants have a controlling interest or which have a controlling interest in Defendants and their legal representatives, assigns and successors; and (c) all persons who

At the time of briefing, Plaintiffs also proposed that a total of twelve (12) subclasses be certified between the two actions. The class definition wording for each subclass is identical to that above, but each subclass would consist of a different named Defendant insurer. With the final approval of the class settlement for Karla McCullough's claims against American International South Insurance Company (Case No. 06-141) and the pending final approval of the class settlement for James K. Jarboe's claims against Progressive Direct Insurance Company (Case No. 06-146), the proposed subclasses have been reduced to ten (10). The class definition wording for each subclass is identical to that above, but each subclass would consist of a particular insurance company. The proposed class representatives for each of the subclasses would consist of the named Plaintiffs who are or were insureds of that particular company. Thus, these 10 subclasses would be as follows:

    (1)    Robert & Johnna Dyas and Gary & Suzanne Wilson v. State Farm Fire and Casualty Insurance Company

    (2)    Gary & Suzanne Wilson v. State Farm Mutual Automobile Insurance Company

    (3)    Jason & Diana Young v. Nationwide Mutual Insurance Company

    (4)    L. Craig Kendrick v. Ohio Casualty Insurance Company

    (5)    Jon Nicholas v. West American Insurance Company

    (6)    Martha Yunker v. Standard Fire Insurance Company

    (7)    Martha Yunker v. Travelers Property Casualty Insurance Company

    (8)    Delbert Kenneth & Mary Beth Perry v. Indiana Insurance Company

---

properly execute and file a timely request for exclusion from the Class.

(9)     Michael & Laura Kiffmeyer v. Cincinnati Insurance Company

(10)    Matthew T. Sanning v. Kentucky Farm Bureau Mutual Insurance Company

Defendants challenge Plaintiffs' proposed class definition as well as breaking the parties into these further subclasses. Those challenges are addressed below as part of the class definition analysis.

## B.     General Considerations in Reviewing a Class Certification Request

Federal district courts have broad discretion in determining whether class certification is appropriate. *Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188, 1197 (6th Cir. 1988). This broad discretion is exercised via the application of Rule 23's structured approach.

For a class to be certified, the class must be adequately defined. Plaintiffs' proposed class must also satisfy each of the four threshold requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. In addition, Plaintiffs must show that the class may be maintained under one of the theories in Rule 23(b); here, Plaintiffs seek certification as a (b)(3) class, where common questions predominate over individual ones.

The Supreme Court has made clear that, when faced with a motion for class certification, district courts are supposed to conduct a "rigorous analysis" of the Rule 23 factors.[12] *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 161 (1982); *Alkire v. Irving,* 330 F.3d 802, 820 (6th Cir. 2003). The burden of establishing all of the necessary requirements rests on

---

[12]The Court conducted an oral argument in this case in furtherance of this standard.

7

the party seeking class certification. *Beattie v. CenturyTel, Inc.,* 511 F.3d 554, 560 (6th Cir. 2007); *In re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1086 (6th Cir. 1996).

What type of and how much evidence is needed for adequate review of a class certification motion is less clear. On one hand, a plaintiff is not being called upon to evidence a likelihood of success on the merits, and "a trial court may not inquire into the merits of a claim." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177-78 (1974). "On the other hand, a trial court is not artificially limited in its analysis to the pleadings, but must take the substantive allegations of the complaint as true while considering the range of proof necessary to establish those allegations." *Tucker v. Union Underwear Co., Inc.,* 144 F.R.D. 325, 326-27 (W.D. Ky. 1992) (referencing *Falcon,* 457 U.S. at 160).

In this case, Plaintiffs' claims rest upon a purported legal failing in the insurance industry in Kentucky, in the context of an insurer's imposition of a local government tax on an insured's premium for those risks located within the geographical boundaries of a local government that has chosen to impose a tax. They seek to prove in this action that because of each Defendant insurer's purported systematic acts or failures to act, a group of its insureds were damaged in the form of charges for local government premium taxes that, in whole or in part, were not actually owed.

## C.   *Defining the Class*

Class definition is not expressly delineated in Rule 23 as a certification requirement. However, it is well-recognized that an acceptable definition of a class is an essential prerequisite to maintaining a class action. *See John v. Nat'l Sec. Fire & Cas. Co.,* 501 F.3d 443, 445 (5th Cir. 2007) (existence of an ascertainable class, represented by the proposed

8

class representative, is an implied prerequisite of Civil Rule 23). Being able to identify members, for purposes of a Rule 23(b)(3) class as is proposed here, furthers providing to the class "the best notice that is practicable under the circumstances[.]" Fed. R. Civ. P. 23(b)(3). Thus, the members of Plaintiffs' subclass should be ascertainable and administratively feasible from the definition as proposed. 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Fed. Prac. & Proc.* § 1760 at 136-40 (2005).

### (1)    Modifying a Class Definition

Some of the Defendants protest that Plaintiffs now impermissibly define the class sought to be certified, in that its terms differ from those contained in the most recent amended complaint in each action. Basically they contend that Plaintiffs are stuck with the definition they originally chose.[13]  The Court disagrees.

Modification or revision of a class definition from that originally proposed does not violate Federal Civil Rule 23. *Id.* § 1760 at 150; *Powers v. Hamilton Co. Public Defender Com'n,* 501 F.3d 592, 619 (6th Cir. 2007) ("district courts have broad discretion to modify class definitions" and citing *Schorsch v. Hewlett-Packard Co.,* 417 F.3d 748, 750 (7th Cir. 2005) (noting that "[l]itigants and judges regularly modify class definitions")). There is no hard and fast requirement under the Rule. In a case such as this, where the parties had extensive time for discovery directed to certification considerations, and where the class initially proposed  was substantial, on balance the named and putative Plaintiffs would be

---

[13]The most recent Amended Complaints in both actions, in defining the class, used the phrase persons "... who were unlawfully charged local government premium taxes or collection fees for the period. . . ."  In their class certification motion, Plaintiffs now seek to define the group as persons "... who were charged local government taxes on their payment of premiums which were either not owed, or were at rates higher than permitted."

unfairly prejudiced if their action were dismissed by demanding adherence to a definition put forth at the outset of the case, prior to discovery and refinement of their definition after legal and practical deliberations.

Defendants also protest that modifying the definition is essentially an amendment of Plaintiffs' amended complaints, without seeking leave to do so. But as noted, limiting or refining a class to comport with Rule 23 is within a court's discretion. *Id.* To the extent such a motion request to refine Plaintiffs' class definition as originally proposed is required, the class certification motion would be viewed and construed by the Court as such a request.

Another of Plaintiffs' proposed definitional modifications includes breaking the litigation into the 10 subclasses noted previously. Defendants challenge that a basic requirement of class proceedings is that each named Plaintiff must be a member of the proposed class. Pointing to Plaintiffs' original omnibus class, Defendants argue this requirement cannot be met, in that an insured of one company lacks standing to sue another company of which that plaintiff was not an insured and so all named Plaintiffs were not members of the proposed class.

Plaintiffs concede this would be problematic if required, and therefore have not attempted to establish such. Each plaintiff having a claim against every named Defendant does not appear to be a mandatory requirement where subclasses are proposed. Rule 23 provides simply that "[w]hen appropriate, a class may be divided into subclasses that are each treated as a class under this rule." Fed. R. Civ. P. 23(c)(5). *The Manual for Complex Litigation* characterizes the requirement as "[e]ach class or subclass must independently satisfy [Rule 23] prerequisites." *Id.* § 21.23 (4th ed.) (emphasis added).

10

Defendants' challenge and Plaintiffs' response on this point highlight a more practical concern of the Court. Namely, should the various claims between particular named Plaintiff insureds and particular named Defendant insurers proceed as a subclass with the two original actions (Case Nos. 06-141 and 06-146) being maintained, or should the subclasses be severed into separate causes of action? The cases in their present form have already reached unwieldy proportions, at what is presently only the class certification stage. Plaintiffs have indicated in their Replies filed in support of their Motions for Class Certification that they shall be moving to sever the causes of action against each particular insurer (see Doc. #386 in 06-141, at p.3 n.3; Doc. #248 in 06-146, at p.3 n.3), but to date have not done so. Nevertheless, pursuant to Civil Rule 21, severance of the claims against each insurer by the named Plaintiffs who are or were insureds thereof is warranted, particularly now moving forward into merits discovery as to each insurer. That is, what Plaintiffs identify as proposed subclasses ought to instead be a separate class action proceeding by way of a severed action. Therefore, the Court will *sua sponte* order each "subclass" be severed and proceed hereafter as a separate action.[14] In light of this severance, the Court's further discussion of Plaintiffs' proposed subclass definition shall be referred to generally herein as the class.

## (2)    Ascertainability of the Proposed Classes

The parties have opposite views on whether identifying persons who are members of the class is readily ascertainable. The focus of this definitional aspect is objectivity; that

---

[14]Case number 06-141 will be closed, and case number 06-146 shall remain on the Court's active docket for purposes of concluding the pending preliminarily-approved class settlement between Jarboe and Progressive Direct Insurance Company.

11

is, whether objective or subjective criteria must be used in order to identify class members. Objective considerations allow for class membership to be ascertained without the need for factual determinations. It also prevents creation of a "failsafe" class, where membership delineation corresponds with an impermissible merits finding. 5 James Wm. Moore, *et al.*, *Moore's Federal Practice* ¶ 23.21[3][c] (3d ed. 2007) (explaining that "[a] class definition is inadequate if a court must make a determination of the merits of the individual claims to determine whether a particular person is a member of the class"). Both sides agree that class membership which hinges on deciding the merits of the putative plaintiffs' claims is prohibited under Rule 23. But they disagree on whether Plaintiffs' description of class members as persons charged a local government tax "either not owed, or [ ] at rates higher than permitted" implicates merits adjudication.

Plaintiffs maintain that identifying who among Defendants' customer base of former and current policyholders are members of the class can be accomplished by examining objective criteria. That criteria, they offer, is (for the relevant time period) the location of the insured property, the geographical boundaries for the relevant local government, the actual local tax for a particular taxing district within whose boundaries the insured property is located, and what local tax was actually charged and collected by the particular subclass insurer Defendant.

Defendants protest that answering these questions is a subjective "merits based" determination and therefore impermissible. Defendants submit that the baseline merits requirement for every claim Plaintiffs assert[15] is that the individual in fact paid an incorrect

---

[15]Although Defendants argued this applies to each of the eight claims asserted by Plaintiffs, for certification purposes Plaintiffs have chosen to limit their claims to four, which limitation decision

12

local government premium tax, be it because no tax was owed or they were charged a rate higher than what was actually owed.

The data considerations associated with Plaintiffs' definition as modified do not amount to a determination of the merits of Plaintiffs' claims. Ascertaining class membership will not require adjudicating the claims' merits. The Court reaches this conclusion despite the expert legal opinions to the contrary offered by Defendants retained legal experts.[16] Defendants and their legal experts evaluated the class definition as originally proposed, wherein terms such as being "unlawfully" charged would have to be determined to ascertain class membership. The Court, as well as Plaintiffs, agree that whether the charge imposed was unlawful, and an individual thereby a class member, would impermissibly require adjudication of Plaintiffs' claims in order to ascertain class membership. *See Manual for Complex Litigation (Fourth)* § 21.222 (2004) ("The order defining the class should avoid subjective standards (e.g., a plaintiff's state of mind) or terms that depend on resolution of the merits (e.g., persons who were discriminated against).").

Plaintiffs' class definition as modified now describes membership as limited to those persons charged a local government tax "either not owed, or [ ] at rates higher than

_____

is discussed subsequently herein.

[16]The Court views these affidavit reports from the law professors only as supplemental legal argument on behalf of Defendants, rather than expert opinion evidence. *See Jenkins v. Hyundai,* 2008 WL 781862, at *3 (S.D. Ohio Mar. 24, 2008); *see also RLJCS Enterprises, Inc. v. Prof. Benefit Trust Multiple Employer Welfare Benefit Plan and Trust,* 487 F.3d 494, 498 (7th Cir. 2007) ("Legal arguments are costly enough without being the subjects of 'experts'" depositions and extensive debates in discovery, in addition to presentations made directly to the judge. If specialized knowledge . . . would assist the judge, the holders of that knowledge can help counsel write the briefs and present oral argument.").

permitted." Defendants, and their legal experts by way of supplemental reports, submit that this wording implicitly still looks to more subjective, liability related considerations as being part of the definitional evaluative process. Professor Linda S. Mullenix's report submits that the definition as modified still calls for the court to address "the two underlying merits issues, which are whether the class members were charged taxes which were owed or not owed, and whether the class members were charged taxes at rates higher than permitted." (See Doc. #354 in 06-141, at App. 3, ¶ 6 and Doc. #233 in 06-146, at App. 3, ¶ 6). Professor Martin H. Redish's report offers that the required finding by the Court would be the same, despite the change in wording. He submits that the present definition would "require this Court to make a legal determination, in the individual case, whether taxes were or were not owed, or whether the rate was higher than permitted" and that whether payment had been "unlawful" under the prior definition "would have been by deciding whether the paid taxes had not been owed or were at a higher rate than permitted." (See Doc. #354 in 06-141, at App. 1, ¶ 17).

The Court finds this argument by Defendants and their legal experts unpersuasive. The proposed definition does not involve state-of-mind considerations, nor does identification of its membership turn on resolving claim merits. The legal experts' characterization of the definition as a merits determination reflective of each Defendants' unlawfulness essentially poses that Defendants are strictly liable. The definition is not couched in terms of subjective standards nor liability considerations, nor does it amount to the Court's resolution of "the core question of liability" as Defendants contend. Although Defendants disagree, Plaintiffs have acknowledged that they must come forth with proof

14

of liability for each of the claims they intend to present for certification.[17]  Answering who paid a local government tax either not owed, or at a rate higher than permitted defines the class, but does not resolve or determine liability.

The questions posed by Plaintiffs' definition raise objective criteria through which membership can be determined.  Procuring a local government's specified geographical boundaries for tax purposes, that government's tax rate for risks within its specified boundaries, and the geographical location of the risk being insured are all matters that, while detailed, are not disputed in the sense of requiring adjudication.  Indeed, a local government's declared tax boundaries and rates may lie within the realm of matters subject to judicial notice.

The definition proposed in this case is not based upon non-specific matters like "wrongful conduct," or subjective factors like "a reasonable time."  *See Crosby v. Social Sec. Admin.,* 796 F.2d 576, 580 (1st Cir. 1986).  Contrary to the proffered legal opinions, it is not dependent upon determining some aspect of merits liability, as was true of other decisions from this district referenced by the parties.  *See Everyone v. E.C. Mortgage Corp.,* 2007 WL 1558512 (E.D. Ky. May 29, 2007) (definition called for determining whether defendant failed to post or credit timely mortgage payments according to the mortgage loan terms); *Brashear v. Perry County,* 2007 WL 1434876 (E.D. Ky. May 14, 2007) (requiring identification of those subjected to unconstitutional prison conditions to

---

[17]This includes, for example, establishing that the tax was a "premium" and that Defendants' conduct was "willful" under the Illegal Dealings in Premium statute; the elements for conversion including the "wrongful" taking; and whether Defendants, in servicing Plaintiffs' insurance needs, breached an asserted duty of care to do so non-negligently by using the best methodologies available to determine tax assignments.

satisfy membership). Simply put, the Court does not agree that pinning down *who* among Defendants' local government premium tax-paying insureds was charged an incorrect tax rate raises the key, and disputed, factual issues on liability that Defendants pose it does. *Why* they were charged the wrong rate *will* raise disputed issues, but not the limited fact that an insured was so charged.

Building on the position that the definition strikes at the key factual issue that is the core to liability, Defendants argue this key factual issue cannot be removed from the jury's province without jeopardizing their Seventh Amendment right. Relying upon *Castano v. American Tobacco Co.,* 84 F.3d 734 (5th Cir. 1996) and *In the Matter of Rhone-Poulenc Rorer Inc.,* 51 F.3d 1293 (7th Cir. 1995), Defendants submit that concluding class membership is ascertainable in this way would run afoul of their Seventh Amendment right to have one jury resolve all factual disputes that go to liability. As noted above, that any true factual disputes will arise in conjunction with class membership, and that any such disputes will go expressly to liability, is anything but certain. As Plaintiffs point out, most of the inquiries associated with discerning class membership are not actually facts in dispute, but objective details in need of verification. But if such genuine factual disputes were to occur, a violation of Defendants' Seventh Amendment rights is not automatic. Specifically, the right protects dividing issues between separate trials in a way that prompts reexamination of the same essential issue by separate juries. *See Cimino v. Raymark Indus., Inc.,* 151 F.3d 297, 321 n.50 (5th Cir. 1998); *see also Paine, Webber, Jackson & Curtis, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 587 F. Supp. 1112, 1117 (D. Del. 1984). Whether such Seventh Amendment concerns would occur here is speculative at

16

this point, and not something that alone should negate certification absent a more specific showing that there is no available manner to try the action that also comports with the Amendment.

Finally on the point of ascertainability, in reviewing this issue of whether the definition as proposed is sufficiently definite and objective to identify class members, the Court is mindful that the litigation thus far in these actions is unique in that there have been [sub]class settlements proposed and finally approved. Certainly the fact that some settling parties in these cases (see note 3, supra) agreed upon a definition for settlement purposes does not bar the litigating Defendants from objecting to the definition now proposed. Nor would the fact of other settlements be relevant to liability as between those insurers that have decided to litigate the merits of the claims brought against them. But neither should the Court ignore that these other finally approved settlements, with their similar definitional language, are at least some evidence of the objectivity of ascertaining members from among those settling Defendants' overall policyholders.

In sum, the Court finds that the definition and criteria for discerning class membership are sufficiently objective, despite Defendants' diligent efforts to persuade the Court otherwise. The definition of the class ultimately is to be determined by the court, not the parties. See Fed. R. Civ. P. 23(c)(1)(B); see also 23(c)(1)(C) (providing that the order may be altered or amended before final judgment). If a proposed definition is not sufficiently definite, a court may modify the definition instead of dismissing the proposed action. See In re Monumental Life Ins. Co., 365 F.3d 408, 414 (5th Cir. 2004); see also Robidoux v. Celani, 987 F.2d 931, 937 (2d Cir. 1993).

17

**(3)     Administrative Feasibility**

In opposing certification, Defendants next offer that if the definition is sufficiently objective, it is nevertheless not admin istratively feasible.    Assessing administrative feasibility pertains to the definiteness of the class and availability of the needed objective criteria, not the convenience of identifying class members.  Plaintiffs maintain that this consideration is directed at whether identifying class membership is mechanically available or procurable, not necessarily administratively easy.  One way this mechanical practicability is furthered is by use of non-subjective criteria, as discussed above.  This renders it more an administrative or ministerial task.  This distinguishes many of the authorities Defendants rely upon to reject feasibility, as those cases turned on the need for more subjective consideration of individual details or persons in order to ascertain the class.  *See, e.g., Kline v. Security Guards, Inc.,* 196 F.R.D. 261, 267 n.5 (E.D. Pa. 2000) (unlawful surveillance could only be determined by individual exam of each purported class member).

Defendants emphasize that the enormous number of policy risk assignment transaction records in this case[18] and the files that may require hands-on review is massive.  But Plaintiffs have the upper hand on this point, referencing several trial courts who recognized that in identifying members, time and labor alone, even where significant, is not a reason to forego proceeding via a class.  *See, e.g., Mitchell-Tracey v. United Gen. Title Ins. Co.,* 237 F.R.D. 551, 560 (D. Md. 2006) (review of individual files may be

_____

[18]The number of policy transactions during the class period and through the time of briefing involving an assignment of risk location by an insurer was as follows: (1) State Farm Auto and Fire - 7,027,320; (2) Nationwide - 339,587; (3) Ohio Casualty and West American - 1,179,746; (4) Indiana Insurance - 462,273; (5) Cincinnati Insurance - 597,922; and Kentucky Farm Bureau - 6,970,763.

laborious, but no indication it cannot be reasonably managed). Defendants do note one case where the trial court rejected the notion that review of individual title search files was administratively feasible. *See Kirkman v. N.C.R.R.,* 220 F.R.D. 49 (M.D.N.C. 2004). However, Plaintiffs point out that other courts presiding over class actions over fiber optic easements, the same legal challenge as in *Kirkman,* did not view such individual title review as administratively infeasible. *See Fisher v. Va. Elec. & Power Co.,* 217 F.R.D. 201, 218 (E.D. Va. 2003).

In considering the potential enormity of the task at hand, particularly for the larger insurer Defendants in these actions, it is significant that the individual review of policyholder files would not involve liability standards or seek to discern a policyholder's state of mind. It would instead be directed at tasks such as examining the risk location and tax code designation for that risk. Similar to the line of title cases relied upon by Plaintiffs, the need to manually review files is not dispositive. If it were, defendants against whom claims of wrongful conduct have been made could escape class-wide review due solely to the size of their businesses or the manner in which their business records were maintained. When faced with the potential of voluminous review to discern claim members, an Arkansas court expressed this balance of considerations as follows:

> "We are not persuaded by the argument that it is not administratively feasible for Lenders to have to manually review each of the more than 50,000 closing files to identify the class members. Instead, we agree with Chandler that Lenders should not be allowed to defeat class certification by relying on its inadequate filing and record system. The fact that Lenders cannot discover such information by the push of a button on a computer does not render the class identification any less administratively feasible. Administratively feasible does not mean convenient. Were Lenders to succeed on this point, it would undoubtedly encourage other businesses to keep bad records for the purpose of avoiding class actions."

ChartOne, Inc. v. Raglon, 283 S.W.3d 576, 581-82 (Ark. 2008) (quoting Lenders Title Co. v. Chandler, 186 S.W.3d 695, 700-01 (Ark. 2004)).

Plaintiffs submit the administrative feasibility of identifying each insured class will be assisted by use of geocoding software in conjunction with Defendants' electronic records. In discovery thus far, Defendants have produced data for policies in an electronic form. Plaintiffs submit, via their software expert Paul Manning, that the provided data from the various Defendants is in a format that can be used in conjunction with geocoding software.[19] This process, according to Plaintiffs, can be used to assist in identifying those insureds for whom an error is detected in the local government tax assignment.

Defendants portray the woes of this process by noting limitations with geocoding software in making insured risk assignments for use in identifying class members.[20] For example, there will be some percentage of each Defendant's electronic data for which the software is unable to match an address with a specific geographic location. That particular result will have to be manually processed. Then, of those that are capable of having a geographic location assigned or matched to an address, it is undisputed that some rate of error of those assignments will occur. That rate of error is essentially unknown, though Defendants' expert ranges it anywhere from 5% to 30%. Defendants submit that because this error rate exists, the Court would be required to conduct an individual factual inquiry

---

[19]The Court previously ruled, in response to motions to limine to exclude Manning, that his precertification opinions directed to the contents of Defendants' electronic data supplied in discovery and the compatibility of that data with geocoding forms of software were admissible. (See Doc. #429 in 06-141 and Doc. #277 in 06-146).

[20]Defendants retained and rely upon Craig Knoblock, Ph.D. to serve as their geocoding computer software expert.

into every one of the millions of local government premium tax code assignments. Plaintiffs maintain that Defendants overstate the nature and extent of what reasonable hands-on individual inquiry would be required, but concede that it could be in the tens of thousands.

The Court is not inclined to accept these defense representations about software deficiencies and individualized review on their face. Rather, feasibility will turn upon the software specifics in the context of how records are maintained by each Defendant and what information is maintained. As Plaintiffs point out, critiquing the prospective results of a geocode software application to policyholder records is not appropriate, instead asking at this preliminary certification stage if the general method is one capable of being used to separate out potential class members. *See Midwestern Mach. v. Northwest Airlines, Inc.,* 211 F.R.D. 562, 566 (D. Minn. 2001).

Again, while not reflective nor suggestive of liability as between the remaining litigants, the various class settlements in these cases to date are relevant as suggesting geocoding software is capable of assisting with the identification of those similarly defined class members, albeit for settlement purposes, when that software was applied to Defendant's electronic policy data. It goes to the administrative feasibility of separating out Defendants' customers who potentially are class members. Moreover, that the Kentucky Department of Insurance now requires use of geocoding software as part of its restructuring of the local government premium taxing, along with the fact that several of the named Defendants also started employing geocoding software before the legislative changes, is relevant in considering the utility of such softwares to assist with tax coding determinations.

21

Plaintiffs submit the subclasses can be discerned with reasonable accuracy using electronic records and geocoding software, in combination with manual verification and clarification.  They acknowledge the possibility that for some Defendants, the manual review of files could be substantial.  But they also note that even if manual identification is required, the class is still administratively feasible despite the time and labor that may be necessary.

The Court concurs in Plaintiffs' assessment of the feasibility of identification, keeping in mind the overall purpose of defining membership.  Defendants would have the Court reject any process, and consequently certification, that fails to identify potential class members with 100% accuracy, or is otherwise suggesting to the Court that a class should not be certified unless 100% accuracy of its composition can be achieved.  This is not the standard.  A class definition's importance is driven by its role in identifying persons entitled to relief, bound by a final judgment, and entitled to notice in a Rule 23(b)(3) case.  *Singer v. AT&T Corp.,* 185 F.R.D. 681, 685 (S.D. Fla. 1998); *see also In re Lupron Marketing & Sales Prac. Litigation,* 228 F.R.D. 75, 93 (D. Mass. 2005) (ascertainability requirement permits court to "decide, among other things, who will receive notice, who will share in any recovery, and who will be bound by the judgment").  A definition should be sufficiently definite to allow identification of members to be administratively feasible, yet the class does not have to "be so ascertainable from the definition that every potential member can be identified at the commencement of the action."  *State ex rel. Coca-Cola v. Nixon,* 249 S.W.3d 855 (Mo. 2008).

Key to the Court's decision at this juncture is whether the class is potentially identifiable with reasonable accuracy, not absolute certainty.  Application of computer

software in combination with manual file review is a workable, albeit time-consuming approach to achieving this end. While the manual review indeed could be significant, particularly with the larger writing insurers, it is not a reason to forego certification and moving the action forward to its merits.

One final comment on administrative feasibility. Throughout the briefing, Defendants, in addition to characterizing the requested class identity feasibility as requiring "millions of individualized inquiries," also suggests "the Court" would be called upon to oversee and/or make these inquiries. As discussed above, much of this setup is ministerial but potentially laborious processing, with some verification or clarification required. This would not directly involve the Court, and the possibility of actual disputes, while unlikely, could be Court addressed in that limited context.

## D.   *"Rigorous Analysis" of the Rule 23(a) Factors*

### (1)   Numerosity

Rule 23(a)(1), commonly referred to as the numerosity requirement, requires an inquiry into whether joinder of all alleged class members would be impracticable. "Impracticability" depends upon all the circumstances of the case. *Cash v. Swifton Land Corp.,* 434 F.2d 569, 571 (6th Cir. 1970). While no specific minimum number of alleged class members is required, Plaintiffs must demonstrate the existence of the numbers of persons they purport to represent. *Gevedon v. Purdue Pharma*, 212 F.R.D. 333, 337 (E.D. Ky. 2002). In making this determination the Court may consider "reasonable inferences drawn from facts before it." *Id.; Senter v. General Motors Corp.,* 532 F.2d 511, 523 (6th Cir.1976), *cert. denied,* 429 U.S. 870 (1976).

23

In this case, the Court is satisfied that Plaintiffs have come forth with sufficient evidence of numerosity for each insurer class. Based upon totals compiled by Paul Manning,[21] Plaintiffs offer that each Defendant has written thousands of policies during the period at issue.[22] Plaintiffs submit that application of even a 1% "error rate" to this total, meaning error in an insurer's tax assignment for risk location, results in putative plaintiff class members of between 270 and 9,000 depending on the insurer. Plaintiffs acknowledge this 1% error rate is an estimate, yet a reasonable inference to make, in that it is based upon Plaintiffs' past experience with identifying members of other settlement [sub]classes in these actions to date, and also considering the results offered by the Kentucky Office of Insurance when they conducted random market analyses of some insurers to gauge the error rate.

In response, the majority of Defendants have not contested numerosity. However, State Farm and Nationwide (Case No. 06-141) and Kentucky Farm Bureau (Case No. 06-146) refuse to concede numerosity, arguing the estimates offered by Plaintiffs are based upon information that is too speculative, given that the number being estimated must represent those who suffered similar injury for similar reasons. This is true; however, Plaintiffs offer of an error rate is intended to separate out from all policyholders those falling

---

[21]Defendants do not dispute and in fact have offered that a substantial number of policy transactions have occurred over the proposed class period. Manning's calculations were derived by reviewing the policy numbers on the electronic databases supplied by Defendants in discovery, and totaling how many of those transactions had unique policy numbers.

[22]Plaintiffs offer the following total number of unique policies for each insurer: (1) State Farm Fire and Casualty Insurance Co. - 452,103; (2) State Farm Auto Insurance Co. - 898,922; (3) Nationwide Mutual Insurance Co. - 137,437; (4) Ohio Casualty Insurance Co. and (5) West American Insurance Co. - 198,645; (6) Standard Fire Insurance Co. and (7) Travelers Insurance Co. - 59,065; (8) Kentucky Farm Bureau - 566,559; (9) Cincinnati Insurance Co. - 98,132; and (10) Indiana Insurance Co. - 51,727.

within that taxation error – those suffering similar injury for similar reasons. An estimate of this rate is a legally permissible method of separating out those persons, provided the rate is not otherwise random or speculative.

Here, Plaintiffs have a base of comparison by the identifications made thus far of persons incorrectly charged local government taxes from among the entire policyholder population of Defendants who have thus far settled. This method of estimating the error rate, which the Court finds to be a reasonable one, distinguishing this case from those authorities referenced by State Farm and Nationwide, where the potential size of the class was much more in the nature of pure speculation or sheer conjecture. *E.g., Gevedon,* 212 F.R.D. at 338 (only information offered was total annual sales of drug, rather than information concerning the number of potential persons in the proposed class specifically).

As to Defendant Kentucky Farm Bureau, its protest is driven by the belief that its tax assignment practices are different from those insurers to whom Plaintiffs look to for error percentage experience. Basically, Kentucky Farm Bureau argues that its assignment techniques, which includes use of tax verification and address verification softwares, are much more detailed and less likely for error, making it unreasonable to apply even a 1% error rate. While such information and practices may ultimately prove true, what techniques were used, the timing of those techniques, the extent to which they were actually used, and the reported results of Kentucky Farm Bureau's success in using them,[23] are points that remain for further merits litigation.

---

[23]In their reply brief, Plaintiffs noted that Kentucky Farm Bureau's status as a domestic insurer precluded Plaintiffs from having access to any of its market conduct exams done by the Kentucky Office of Insurance, as they are protected from disclosure under the Kentucky Open Records Act.

Accordingly, as Plaintiffs have at least identified a large enough number of proposed class members to determine that joinder of all members would be impracticable, the Court concludes that the numerosity requirement of Rule 23(a)(1) has been satisfied for each of the remaining Defendants.

### (2) Commonality

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." This requirement is qualitative rather than quantitative; in other words, there need only be one issue common to the class. *In re Am. Med. Sys.,* 75 F.3d at 1080. However, the Sixth Circuit has cautioned that, "at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality. What we are looking for is a common issue the resolution of which will advance the litigation." *Sprague v. Gen. Motors Corp.,* 133 F.3d 388, 397 (6th Cir. 1998). Thus, while there need only be one common issue, that issue must not be at too great a level of generalization or abstractness. *Id.* at 397.

In this case, commonality is easily met. Certainly the fact common to the class is whether each member was charged an incorrect amount for local government premium taxes, which is also the preliminary inquiry for class membership. To the extent it could be said this common question does not advance the litigation because it relates to class definition only, Plaintiffs offer the additional fact question of whether the insurer had a uniform, institutional policy or practice to identify local government taxing districts for insureds.

Moreover, Plaintiffs' presentation is based on not just the fact that the actual local government premium tax charged them pursuant to the insurer's practices was factually

26

incorrect, but that it was also wrongful or unlawful to charge them these taxes pursuant to

this common practice or policy.  Plaintiffs provide the following as representative of the

core common legal questions among the putative class members:

1) have Defendants engaged in unlawful billing practices and illegal dealings contra to Kentucky's Illegal Dealing in Premiums statute, KRS 304.12-190;

2) is a "charge" on a premium a tax within the meaning of the Illegal Dealing statute;

3) does "willful" under the Illegal Dealing statute require individual proof of intent;

4) does Defendants' collection of taxes that were either not owed or at rates higher than permitted constitute conversion;

5) are Defendants authorized to charge their customers a collection fee that is in addition to an otherwise lawful premium tax;

6) do Defendants owe Plaintiffs and class members a duty to use best methodologies available to determine the applicable local government premium tax; and,

7) does Defendants' charge of additional fees to Plaintiffs and Class members violate Kentucky Department of Insurance regulations for servicing the collection of municipal taxes imposed by local governments.

The heart of Defendants' opposition to commonality, as well as the other Rule 23

requirements generally, lies in the theme that the only way these claims can be advanced

is through examination and presentation of each individual policyholder's circumstances.

This contention started with their challenge to class definition and is woven throughout

Rule 23's other requirements – that any form of litigation by policyholders over these taxes

is necessarily advanced only by examining each individual policyholder's circumstances.

They challenge that Plaintiffs' common questions are simply too broad and generalized.

But Plaintiffs submit the transactions here are capable of common method analysis.

They submit that from the pre-certification discovery thus far, they have learned that many

27

Defendants had adopted a method for assigning and calculating local government premium taxes that is, in fact, common to their insureds and that these methods do not include geocoding at the institutional level to verify the accuracy of the tax assessment. Plaintiffs reference the following practices, or lack thereof, for the various Defendants:

- State Farm, prior to 2007, did not require agents to use any reference source to confirm location, relying only on information from the insured. (Plaintiffs acknowledge that with State Farm's implementation of geocoding software in late 2007, they now allege that State Farm engaged in the routine practice of failing to use appropriate means to verify the location of its insured's property until the end of 2007.)

- Nationwide agents gather identical information and rely upon it to create policies and bills, but the company does not have a policy of verifying the accuracy of tax assignments using geocoding.

- Ohio Casualty and West American relied on agent knowledge to select tax assignment and agents can consult other sources, but there is no company-wide or directed use of secondary sources to verify accuracy of assignment.

- Standard Fire and Travelers relied on local agent knowledge with access to secondary sources, but no company-wide or directed use of them to verify accuracy.

- Indiana Insurance relied on agent knowledge to select tax assignment (after being computer prompted on whether the mailing address and location of the risk are the same), in conjunction with a Personal Lines System that uses the Department of Insurance table of jurisdictions and codes. There is no further backup or verification of accuracy system used.

- Cincinnati Insurance, prior to 2006, relied on agents to collect information on personal line and commercial line policies, then used by the Underwriting Department to assign the risks based on city and county name provided. (Plaintiffs acknowledge that with Cincinnati Insurance's implementation of geocoding software in March 2006, they now allege that Cincinnati Insurance engaged in the routine practice of failing to use appropriate means to verify the location of its insured's property until March 2006.)

- Kentucky Farm Bureau relied on agents and insureds to provide information that was then used in tax assignment programs lacking in any GPS feature, until its "recent" implementation of geocoding software. (Plaintiffs acknowledge that with Kentucky Farm Bureau's implementation of geocoding software, they now allege that Kentucky Farm Bureau engaged in the routine

28

practice of failing to use appropriate means to verify the location of its insured's property until it adopted and institutionalized use of the Group 1 software.)

Each side has very different views of how these claims are litigated, which views go directly to whether a class presentation is appropriate. Plaintiffs believe there is enough commonness to "who" was charged incorrect local government taxes and "why" they were so charged, that the "who" can be separated from all policyholders to constitute the class and the "why" of liability can be presented on a class-wide evidentiary basis. Defendants believe it is all too individually driven, from the initial confirmation of which policyholders paid an incorrect tax that was excessive, to the individual presentations of liability theories, to the individually-specific defenses that would be asserted. Like so many of the authorities the parties here rely upon, each case turns upon its own circumstances, including the instant one. Here, Plaintiffs offer at this stage what they believe will be solidified through merits discovery, proof of routine and standardized processes toward insureds and that these processes are insufficient to satisfy each insurer's legal obligations under the various liability theories.

In *Falcon*, the Supreme Court noted that class actions may be appropriate where "the issues involved are common to the class as a whole and where they turn on questions of law applicable in the same manner to each member of the class" such that the common issue may be litigated for all in an "economical fashion." *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 155 (1982) (citations omitted). From a practical standpoint, commonality is required because it should provide a means for saving resources for both the Court and the parties and resolve the issue in an economical fashion. *See Am. Med. Sys.,* 75 F.3d at 1080.

29

At this procedural stage, the questions in this case under the case theory as advanced by Plaintiffs suggests the same fact questions directed at each insurer's practices and the same questions of law would apply to each insured and Defendant insurer class. Defendants of course have a different view on how proving these claims must be done. Regardless, at this juncture, the Court cannot conclude that the Plaintiffs' approach to the case lacks commonality in its factual and legal questions.

### (3)    Typicality

Rule 23(a)(3) requires that the claims of the class representatives must be typical of the claims of the class. *See* Rule 23(a)(3). As is often remarked, "as goes the claims of the named plaintiff[s], so go the claims of the class." *Sprague,* 133 F.3d at 399. The class representatives' interests must be aligned with those of the putative class and the pursuit of their claims must also advance the interest of the class. *Am. Med. Sys.,* 75 F.3d at 1082. Although the class representatives' claims need not always involve the same facts or law, there must be a common element of fact or law. *Senter v. Gen. Motors Corp.,* 532 F.2d 511, 525 (6th Cir. 1976).

As the named Plaintiffs have pointed out, their injuries are typical in that each is comprised of an incorrectly charged local government premium tax. That they have each suffered damages was confirmed in the course of their pre-certification discovery depositions. This alone, offers Plaintiffs, is sufficient for typicality purposes as the Rule requires there be only one common element of fact or law for typicality. They press on to point out that typicality is also shown by the named representatives' position that those damages are legally recoverable because they arose from a legal wrong committed by each Defendant insurer upon not just the corresponding named insured Plaintiff, but other

similarly situated insureds. That legal wrong, typical to the named insured and putative class members according to Plaintiffs, rests on the insurer's alleged company-wide failures in their policy and practices of assessing local government taxes.

Defendants' arguments opposing typicality continue the theme underlying their defense – that whether a member paid a tax not owed is a fact question unique to them requiring individual proof, and that resolving the named Plaintiff's claims will not resolve claims belonging to the class. Each Defendant discusses and emphasizes the individual circumstances surrounding how each corresponding named insured Plaintiff came to have a local government premium tax imposed, arguing this negates typicality of the named Plaintiffs. Defendants remark on such circumstances as how the Plaintiffs' insurance application was completed, any so-called errors it contained in identifying the address of an insured risk, what verbal or written representations were made to agents by Plaintiffs about their tax districts, and similar information in posing that the named Plaintiffs cannot be typical.

Ultimately, Plaintiffs' focus upon the fact that an insured was charged the wrong tax and that there was a method or process or system by each Defendant for what caused this incorrect charge is sufficient for typicality purposes, despite articulated factual distinctions among insureds that Defendants rely upon. The various authorities Defendants look to in challenging typicality were cases where the proof necessary to sustain a claim was undisputed, nor was it disputed that certain elemental aspects of that proof were highly individualized. *See, e.g., Ball v. Union Carbide Corp.,* 385 F.3d 713 (6th Cir. 2004) and *Kurczi v. Eli Lilly & Co.,* 113 F.3d 1426 (6th Cir. 1997) (toxic tort claims, where highly individualized nature of claims negated commonality and typicality); *Bacon v. Honda of*

31

*America,* 370 F.3d 565, 572 (6th Cir. 2004) (subjective nature of decision-making process negated typicality in employment discrimination case); *Ploog v. HomeSide Lending, Inc.,* 2001 WL 1155288 (N.D. Ill. 2001) (individualized correspondence critical to proving RESPA claims negated typicality).

Moreover, a "rigorous analysis" of Rule 23(a) factors does not mean Plaintiffs must, at this stage, come forth with evidence to prove their claims, despite Defendants' arguments to the contrary. *See Eisen,* 417 U.S. at 177 ("We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action."); *see also Daffin v. Ford Motor Co.,* 458 F.3d 549, 553 (6th Cir. 2006) (rejecting that "rigorous analysis" required to certify class "includes determining whether class members could 'prove' an Ohio breach of warranty claim").

The parties hereto have a fundamental difference in proof to be used to establish why an incorrect tax came to be imposed. Defendants' more individualized transactional facts on why an incorrect tax came to be charged are a different theory and defense of the claims. It does not trump the typicality argued by Plaintiffs when they point to an insured's reliance upon informal practices or procedures such as an insured's self-assessment of tax assignment as the basis for their claims.

### *(4)     Adequacy of Representation*

In order to satisfy Rule 23(a)(4), the class representative must have common interests with the unnamed members of the class and it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel. *Senter,* 532 F.2d at 524-25; *see also Cross v. National Trust Life Ins. Co.,* 553

32

F.2d 1026 (6th Cir.1977) (The rule tests "whether there is any antagonism between the interests of the plaintiffs and other members of the class they seek to represent" and "the experience of the counsel for the plaintiffs.")

Plaintiffs offer they have and will continue to vigorously prosecute the claims by their participation in this suit. Their prosecution of the litigation to date would support this statement. Nevertheless, Defendants draw attention to the deposition testimony of various named Plaintiffs as demonstrating their lack of understanding of the claims they present in this case and what it means legally to represent a class of persons on a claim, their commitment to furthering each claim, and their day-to-day involvement in that process.

The Court rejects such a conclusion. Each Plaintiff is aware he or she is named as a representative, understands generally that this role imposes obligations to act in the interests of a group rather than his or her own personal interests, has participated in written and testimonial discovery, and has otherwise been involved in the litigation steps to date in a diligent and dedicated manner. The fact a named Plaintiff may be unfamiliar with legal nuances of class actions or have an expectation of looking to counsel for guidance and advice are not deficiencies rendering their service as representatives suspect, particularly when they and their claims have fulfilled the other Rule 23(a) considerations.

On this point of adequacy, Defendants also make much of the fact that the named Plaintiffs now indicate a willingness to retract on certain class claims asserted in their amended complaints and seek to pursue against each insurer only their claims for illegal dealings in premiums, conversion, negligent servicing, and declaration of rights. Defendants complain that Plaintiffs must present all of their claims in conjunction with their certification request. Eliminating claims, Defendants maintain, evidences that the

33

representatives do not have the best interests of the class in mind, as they are willing to compromise the due process rights of absent putative class members in exchange for what they perceive to be ease of presentation of their remaining claims. Defendants offer their interest lies in protecting the rights of those putative class members who might wish to pursue one of these foregone claims, who will now have that right taken away from them.

In response, Plaintiffs represent that in addressing certification, they have considered each of their claims originally asserted and the ability to present and pursue those claims on a class-wide basis. In doing so, certain claims in counsel's judgment, evidenced serious hurdles in advancing in a class format, and strategically they have chosen not to pursue such claims for pursuit by the class. Plaintiffs' refinement of the claims they seek to advance forward as somehow rendering them inadequate as representatives is unsound. Indeed, the Court early on strongly suggested to Plaintiffs that they carefully consider what it was they intended to pursue in the advancement of these proceedings.

However altruistic Defendants' motive, seeking certification of each claim initially pled in a proposed class action does not appear to be mandatory under Rule 23. The Court's research reveals no blanket rule preventing Plaintiffs from exercising such judgment, nor have Defendants pointed out any. Moreover, any concerns Defendants may have about a putative plaintiff's loss of rights or desire to advance a particular claim no longer being pursued on a class basis can, as Plaintiffs point out, be addressed by way of the wording of the notice sent to class members, allowing a decision to opt out by any putative plaintiff who, for whatever reason, desires to preserve one of those claims.

34

Some of the Defendants assert the corresponding named insured Plaintiffs have potential conflicts of interest that prevent them from adequately advancing the interests of the class they serve. The Court finds these challenges to certain Plaintiffs' adequacy unavailing. Whether it is the unbeknown post-filing refund of excess taxes to Plaintiffs Jason and Diana Young by way of credit to their account, the partial reimbursement to Plaintiff Delbert Perry, or the so-called "appearance of lack of independence" of Plaintiff Jon Nicholas because his wife is employed with the county attorney's office where some of Plaintiff's counsel also serve as prosecutors, the Court is not persuaded that any of these matters amounts to an actual conflict that renders that Plaintiff's interest antagonistic to the particular class.

The final consideration under the adequacy prong is directed toward class counsel. Specifically, Rule 23(g)(1)(A) directs a court's attention, in considering class counsel, to four areas: (1) work done in identifying and investigating claims in the action; (2) experience in handling class actions or complex litigation; (3) knowledge of applicable law; and (4) resources counsel will commit.

The background information provided by Plaintiffs' counsel, and their conduct throughout these proceedings, demonstrates their experience in these types of cases. The filing attorneys also opted at an early stage to have Attorneys Mason and Whitfield, with their extensive litigation experience in class actions, added as counsel. Their work and general knowledge of the law have been demonstrated throughout this proceeding, and throughout the case they have committed the resources necessary to continue pursuing these claims. All of these points satisfy the Court that counsel are competent and capable of serving as class counsel.

35

Some of the Defendants separately briefed adequacy of counsel, challenging that Plaintiffs' counsel's representation of local government entities in a proceeding separate, but relating to the same local government premium tax issue, presented a conflict of interest for counsel. Those attorneys who were Plaintiffs' original counsel here and also involved in that other litigation have since been permitted to withdraw in that proceeding. Without further particularized concern by Defendants, the Court is persuaded on the adequacy of counsel, considering this prong is sometime s presumed absent such particularized showing. The current record lacks any serious basis upon which counsel's adequacy should be questioned.

## E.     Rule 23(b)(3) Requirements

In addition to satisfying Rule 23(a)'s prongs, Plaintiffs must also establish what form of class action should be pursued by satisfying one of Rule 23(b)'s subsections. Here, Plaintiffs rely upon (b)(3) – calling upon Plaintiffs to show "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Thus, subsection (b)(3) is directed to two things – predominance and superiority.

The predominance requirement of (b)(3) dovetails Rule 23(a)'s commonality and typicality requirements. Courts often find them to be inextricably intertwined and discuss them together. While the preliminary requirements necessitate the showing of but one question of law or fact common to the class and that would advance the litigation, seeking certification of a (b)(3) class requires litigants show that common questions will predominate over individual ones.

36

The commonality and typicality sections above discussed in some detail the many fact and legal questions Plaintiffs pose as common to themselves and their respective class. They emphasize that the class-wide fact question over each insurer's practices, or lack thereof, in assigning tax districts is a key and predominant question in their claims against each insurer. Moreover, each of their several legal questions prompted in conjunction with their asserted class claims (e.g., illegal dealing in premiums, conversion, negligent servicing, and declaration of rights) have already been noted herein; each legal question applies to the entire class and also predominates.

The individualized issues raised by Defendants would predominate only were Plaintiffs unable to present generalized proof of Defendants' company-wide policies and practices with respect to local government premium tax assignments. Plaintiffs do not deny that individual questions do exist. They simply do not believe that they overshadow or predominate the common legal and factual questions discussed. The Court concurs in this observation. *See Beattie v. CenturyTel, Inc.,* 511 F.3d at 564 (plaintiffs must also show that issues subject to generalized proof predominate over those issues subject to individualized proof). Defendants may have comparative defenses to raise based on individual circumstances in making tax assignments, but denial of certification would be warranted only if those defenses predominated over the common, generalized proof Plaintiffs contend can be offered to establish class-wide legal liability. *See In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 136 (2d Cir. 2001) ("fact that a defense may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones") (internal quotation omitted).

37

In addition to showing that common questions predominate over individual ones, for certification under (b)(3) Plaintiffs must also demonstrate that certification of a class is a superior method of adjudicating Plaintiffs' claims, and that the action is manageable as a class. Plaintiffs submit the class method is superior, and manageable, because the subclasses can be discerned with reasonable accuracy using electronic and geocoding software and/or, if necessary, manual identification. As to superiority, the Court would be hard-pressed to identify a more appropriate case for class treatment, given the potential size of the class, the state-wide reach of the alleged misconduct, and the smallness of each putative plaintiff's claim.

Looking at the manageability of continuing this litigation as a class action, whatever concerns the Court might have had, they have been alleviated by Plaintiffs' suggestion of subclasses and now severance. The magnitude of maintaining the four claims against all the various insurers in just two cases was already doubtful; pressing on to merits discovery, where the particular business practices of individual insurers becomes more significant, makes it even more compelling to separate these claims into separate actions. The action would simply not be manageable in its present omnibus form, but this concern is remedied by the severance ordered herein.

Finally, the Court is to consider whether there are alternative methods of addressing Plaintiffs' injuries superior to a class action. Defendants seek to revisit their prior arguments about the value of utilizing administrative remedies provided through the Kentucky Department of Insurance. The Court previously ruled that administrative remedies were not exclusive under the then-existing laws. Kentucky's now revised statutory scheme compels administrative review. But those legislative changes do not

38

apply to this pending litigation.  The Court already examined this point at length previously in this litigation, including the appropriateness of deferring the claims to what was then discretionary administrative review.  It is not an alternative method superior to a class action at this point.

## CONCLUSION

For the reasons stated herein, **IT IS ORDERED** as follows:

(1)     Defendants' Motion for Leave to File Supplemental Argument (Doc. #445) in **06-141** and (Doc. #295) in **06-146** be, and they hereby are, **granted** as unopposed.

(2)     Plaintiffs' Motion to Certify Class (Doc. #333) in **06-141** and (Doc. #214) in **06-146** be, and they hereby are, **granted.**  A class in each of the severed actions as described immediately below, defined as proposed by Plaintiffs' in their motion, shall be certified, with respect to the Plaintiffs' claims of Illegal Dealing in Premiums, Conversion, Negligent Servicing, and Declaration of Rights.

(3)     The Court on its own motion hereby **severs** from these proceedings all claims between the following parties:

In **06-141**:

(a)     Robert and Johnna Dyas and Gary & Suzanne Wilson v. State Farm Fire and Casualty Insurance Company

(b)     Gary and Suzanne Wilson v. State Farm Mutual Auto Insurance Company

(c)     Jason and Diana Young v. Nationwide Mutual Insurance Company

(d)     L. Craig Kendrick v. Ohio Casualty Insurance Company

(e)     John Nicholas v. West American Insurance Company

(f)    Martha Yunker v. Standard Fire Insurance Company

(g)    Martha Yunker v. Travelers Insurance Company

In **06-146**:

(a)    Kenneth and Mary Beth Perry v. Indiana Insurance Company

(b)    Michael and Laura Kiffmeyer v. Cincinnati Insurance Company

(c)    Matthew Sanning v. Kentucky Farm Bureau Mutual Insurance Company

The Court Clerk is instructed to open a new civil action number for each of the above actions, with this Order being docketed in each of those actions and with a Clerk's notation cross-referencing 06-141 or 06-146 as the initiating litigation. The Clerk shall also file in each action a copy of the most recent Amended Complaint from the initiating litigation, and a copy of the named insured Defendant's Answer thereto. Within 30 days from the date of this Order, Plaintiffs in each action shall pay the required filing fee.

(4)    Civil action 06-146 shall remain on the active docket of this Court pending completion of the preliminarily approved Jarboe-Progressive Direct Insurance Company class settlement; civil action 06-141 shall be administratively closed.

This 30th day of September, 2010.

**DAVID L. BUNNING, JUDGE**
**UNITED STATES DISTRICT COURT**

G:\DATA\Opinions\Covington\06-141 & 06-146 Class Certification Order.wpd

40